**Vincent C. CLARK, Michael G. Haggarty, and Robert E. Snauffer, Plaintiffs,**

v.

**The BANK OF NEW YORK, Irving Trust Company, and Manufacturers Hanover Trust Company, Defendants.**

**No. 90 Civ. 4072 (MBM).**

United States District Court, S.D. New York.

Aug. 25, 1992.

---

Richard C. Yeskoo, Fabricant, Yeskoo & Colangelo, P.C., New York City, for plaintiffs.

Sean R. Kelly, Anne T. Schwab, Saiber, Schlesinger, Satz & Goldstein, Newark, N.J., and New York City, for defendant Bank of New York.

## OPINION AND ORDER

MUKASEY, District Judge.

In this action for employee benefits, the parties have taken profligate advantage of the availability of pre-trial motions. Defendant The Bank of New York (hereinafter "defendant" or "the Bank") has moved for summary judgment pursuant to Fed. R.Civ.P. 56(i) as to Count One on the ground that no material issue of fact remains in dispute, and (ii) as to Counts Two, Three, and Four on the ground that those

state-law claims are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Defendant also has moved pursuant to Fed. R.Civ.P. 37 to dismiss the claims of plaintiffs Vincent C. Clark and Robert E. Snauffer for their alleged misconduct during discovery. Plaintiffs have cross-moved: (1) to strike the affidavit of Douglas J. Tantillo; (2) to add as a named defendant "Frank Peterson, as Administrator of the Irving Bank Corporation Separation Policy"; and (3) to require production of Joseph J. Tenicki's 1988 and 1989 telephone records at the Bank. Plaintiff Snauffer has moved for partial summary judgment as to Count One of the Complaint. Plaintiff Clark has moved to disqualify Saiber Schlesinger Satz & Goldstein ("SSS & G") as defendant's counsel. Finally, defendant has moved, pursuant to Fed.R.Civ.P. 11 and 28 U.S.C. § 1927, to sanction Clark for his disqualification motion. For the reasons set forth below, defendant's motion for summary judgment as to Count One is denied, as is defendant's motion to dismiss Clark's and Snauffer's claims; however, defendant's motion for summary judgment as to Counts Two, Three, and Four is granted. Clark's motion to disqualify SSS & G will be the subject of a hearing as to the issue specified below, but is otherwise denied. The remainder of plaintiffs' cross-motions are denied. Decision on defendant's motion for sanctions is reserved until Clark's disqualification motion has been decided in full.

### I.

Before defendant's hostile takeover of Irving Bank Corporation on November 28, 1988, plaintiffs Clark, Snauffer, and Michael G. Haggarty were members of the Irving Trust Public Finance Department ("the PFD"). The PFD, formed by Irving in or about 1985, sought to promote Irving as advisor, placement agent, or lead managing underwriter for securities offerings by issuers of tax exempt securities. (Tantillo Aff. ¶ 6)

Clark and Snauffer were investment bankers who specialized in bond issues for not-for-profit hospitals. (Clark Dep. at 57; Snauffer Dep. at 110–15, 125–30, 163) Haggarty had dual responsibilities at Irving in 1988: he was (1) the investment banker in charge of Irving's industrial development bond issues; and (2) assigned to help Snauffer market Irving's financial services to not-for-profit hospitals. (Haggarty Dep. at 20, 31, 38, 45)

At the beginning of 1988, plaintiffs and five or six other employees were marketing officers; the remaining eight to ten members of the PFD were support personnel responsible for credit analysis and administration. (Clark Dep. at 83; Snauffer Dep. at 12) All of the employees in the PFD reported *directly to* Joseph J. Tenicki, a senior vice president of both Irving and the Bank. (Def. Statement Pursuant to Local Rule 3(g) ¶¶ 8, 9)

On November 29, 1988, the day after defendant completed its hostile takeover of Irving, there were nine employees in the PFD: plaintiffs, Tenicki, two secretaries, and three other employees. (*Id.* ¶ 3) By February 1989, two of those three other employees had resigned and the third had been reassigned to defendant's Municipal Bond Department. (*Id.* ¶¶ 4–6) That third employee was assigned again to the PFD in or about April 1989. (*Id.*)

On April 18, 1989, plaintiffs submitted a memorandum to Tenicki, claiming that their duties and responsibilities had been diminished materially since defendant's takeover of Irving (Second Yeskoo Aff. Ex. A); plaintiffs also sent a copy of their April 18 memorandum to Douglas J. Tantillo, who was a vice president of the Bank, assigned to the Personnel Division. (*See Id.*) In that memorandum, plaintiffs claimed that their duties and responsibilities had been diminished materially in the following ways:

—Material diminution in manpower of the [Public Finance] [D]epartment;

—Removal of important internal operation and credit support;

—Elimination of credit approval process;

—Major reduction in market capability;

—Significant loss of deals due to the lack of commitment to the industry;

—No communication from BNY management since the merger;

—No backlog of new business; and

—Severe jeopardy to [plaintiffs'] professional careers.

(*Id.*)

Plaintiffs' April 18 memorandum put defendant on notice that plaintiffs intended to resign and submit claims for severance benefits under the Irving Corporation Separation Policy ("the Plan"), which Irving had adopted in 1988. (Compl. ¶ 9) *Inter alia,* the Plan provided severance benefits to Irving employees in the event control of Irving changed and, within two years of that change, the claiming employee's job duties and responsibilities materially diminished. (Compl. Ex. A §§ 4.1, 4.2(a)(iii), 4.3)

In the morning of April 26, 1989, Clark and Haggarty met with Deno D. Papageorge, who was the senior executive vice president and chief financial officer of the Bank, as well as with Tenicki, Tantillo, and another member of the personnel department. Papageorge said that he had not yet "gotten around to the Public Finance Department," but that he intended to maintain the PFD and to restaff it with internal transfers. (Second Yeskoo Aff. Ex. D)

On April 26, sometime after they met with Papageorge in the morning, Clark, Snauffer, and Haggarty submitted letters of resignation, as well as formal requests under the Plan for separation benefits. (*Id.* ¶ 7 and Ex. E)

Frank L. Peterson, who was a senior vice-president in charge of defendant's personnel division, served as plan administrator. (*See* Peterson Dep. at 18) In his capacity as plan administrator, Peterson delegated primary responsibility for investigating plaintiffs' claims for severance benefits to Tantillo. (*Id.* 17–18) Tantillo apparently investigated plaintiffs' claims only by discussing plaintiffs' April 18 memorandum with Tenicki. In addition, Peterson discussed plaintiffs' claims with Papageorge and John A. Ross, who was an executive vice-president of the Bank. According to Peterson, both Papageorge and Ross told him that "very much they wanted [plaintiffs] to stay and [Peterson] should try to convince them to stay with the bank and that we very much wanted to stay in that business." (*Id.* at 11–12)

In memoranda dated May 2, 1989 from Tantillo to Peterson, Tantillo asserted that each plaintiff's claim under the Plan should be denied because defendant had:

(1) a commitment to continue in the healthcare finance business in the not for profit sector, which was communicated to said employee by the Sector Head, Deno D. Papageorge, SEVP, and Joseph J. Tenicki, SVP, Department Head, on the morning of April 26, in Mr. Papageorge's office, and;

(2) a commitment to restaff the function to a level commensurate with the Corporations [*sic*] strategic plan if further resignations occurred; also communicated to the employee at the same time as (1) above.

(Second Yeskoo Aff. Ex. F)

In identical letters dated July 24, 1989, defendant denied plaintiffs' respective claims. Each of those letters stated that defendant was denying the claim for severance benefits because,

in our opinion, there has been no material diminution of duties and responsibilities so as to occasion the payment of benefits.

More specifically, on April 26, 1989, Mr. Deno D. Papageorge, Sector Head and SEVP, and Mr. Joseph Tenicki, Department Head and SVP, met with you to discuss your concerns. Mr. Papageorge was there specifically to reassure you of The Bank of New York Inc.'s commitment to continue in the healthcare finance business in the not-for-profit sector. In addition, you were also notified that there was no change in your duties and responsibilities.

Recognizably, the merger has impacted business to the extent that we have had some unanticipated turnover in staffing. However, a further commitment was made to restaff the function to a level commensurate with the corporation's strategic plan if further resignations occurred.

Therefore, as there was no change in your job responsibilities and not even the prospect of further diminution, you are not eligible for severance benefits and your claim is denied.

(*Id.* Ex. G)

Plaintiffs requested that Manufacturers Hanover Trust Company, which was the trustee of the Irving Benefits Protection Trust (alternatively "the Trust" or "the Benefits Protection Trust"), review defendant's denial of their claims for separation benefits. The Benefits Protection Trust was established to "provide a legal defense fund to protect the specific benefits" promised to Irving employees under the Plan. (*Id.* Ex. I) "The trustee will have a fiduciary responsibility to negotiate and litigate legitimate claims on behalf of employees." (*Id.*) In the case at hand, the trustee determined as to each plaintiff that, "under the terms of the Trust, it would be inappropriate to apply further Trust assets to attempt to enforce your claim on your behalf, and we have instructed our legal counsel accordingly. Of course, you are free to engage independent legal counsel and pursue your claim yourself." (Tantillo Aff. Ex. E)

On or about June 15, 1990, plaintiffs instituted this case. They allege claims pursuant to ERISA, as well as pendent state-law claims.

## II.

Fed.R.Civ.P. 56(c) requires a summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The disputed issues of fact must be "material to the outcome of the litigation," *id.* at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

## III.

■ Plaintiffs cross-move pursuant to Rule 56(e), Fed.R.Civ.P., to strike Tantillo's affidavit. I have addressed this cross-motion first because its disposition determines what evidence is to be considered on defendant's motion for summary judgment as to Count One.

Rule 56(e) requires that, "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

■ Plaintiffs argue that "Tantillo was not part of the Public Finance Division, and

is not competent to testify from first-hand personal knowledge about plaintiffs' duties and responsibilities or any diminution thereof." (Pl. Mem. at 18) However, Peterson delegated to Tantillo responsibility for investigating plaintiffs' claims under the Plan. When the primary question at hand is the validity of the plan administrator's decision to deny claims under the Plan, the person investigating those claims on behalf of the plan administrator certainly has personal knowledge as to the plan administrator's basis for denying those claims. Moreover, Tantillo's affidavit serves to introduce original documents, the validity or which plaintiffs do not contest. Accordingly, plaintiffs' motion to strike Tantillo's affidavit is denied.

## IV.

Defendant moves for summary judgment as to Count One on the ground that no material issue of fact remains in dispute.

■ As a threshold matter, I must determine what standard of review applies to Peterson's determinations, as plan administrator, that plaintiffs were not eligible under the Plan for severance benefits. Plaintiffs argue that Peterson's determinations are subject to *de novo* review; defendant contends that his determinations are subject to a more deferential standard of review.

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that, "Consistent with established principles of trust law, ... a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115, 109 S.Ct. at 956. Therefore, *"de novo* review is the default standard unless the plan expressly gives the administrator 'the power to construe uncertain terms or [provides] that eligibility determinations are to be given deference.'" *Schein v. News Am. Publishing, Inc.*, 1991 WL 117638, at *3, 1991 U.S. Dist. LEXIS 8504, at *9–10 (S.D.N.Y.

June 25, 1991) (brackets in original) (quoting *Firestone*, 489 U.S. at 111, 109 S.Ct. at 954). Moreover, "Although magic words such as 'discretion' and 'deference' are not absolutely necessary, 'a narrow view of when a plan document confers discretionary authority is needed to check the potential for biased decisions on the part of ERISA plan administrators.'" *Schein*, 1991 WL 117638, at *3, 1991 U.S. Dist. LEXIS 8504, at *10–11 (citation omitted) (quoting *Guisti v. Gen. Elec. Co.*, 733 F.Supp. 141, 147 (N.D.N.Y.1990)).

In the case at hand, the Plan does not expressly give the administrator discretionary authority to decide eligibility or to interpret the Plan's terms. Nonetheless, defendant argues that Peterson, as plan administrator, was vested with discretion because he had the authority to determine whether, within two years of a change in control, a plan participant's duties and responsibilities had been "materially diminished," so as to entitle the participant to severance benefits. (Compl. Ex. A § 4.2(a)(iii)) Although the phrase "materially diminished" is not self-explanatory, its ambiguity is not enough to support a finding that the Plan vested the plan administrator with discretion. Virtually no standard of conduct that is not based on mathematical computation can be completely self-defining. As a result, if the mere inclusion in a benefits plan of a term such as "material" were enough to confer discretion on the plan administrator, all but the most mechanical decisions by plan administrators would be protected by the abuse-of-discretion or arbitrary-and-capricious review standard. That would turn on its head what is supposed to be the usual rule—namely, that the *de novo* standard is the default standard of review and that the plan administrator appears to bear the burden of proving that "it does wield discretionary authority over benefits decisions." *Arthurs v. Metropolitan Life Ins. Co.*, 760 F.Supp. 1095, 1098 (S.D.N.Y.1991).

By contrast, defendant would have me apply *Bogue v. Ampex Corp.*, 750 F.Supp. 424 (N.D.Cal.1990), which found that the plan in question conferred discretion on the

plan administrator to determine whether a participant's new position was "substantially equivalent to your current position." *See id.* at 427. However, I decline to follow *Bogue* because the plan there did not explicitly grant discretionary authority to the plan administrator. Although a plan need not contain "magic words such as 'discretion' and 'deference,'" *Schein,* 1991 WL 117638, at *3, 1991 U.S. Dist. LEXIS 8504, at *10–11 (citation omitted) in order to be found to have conferred discretion, the plan must "*give* [ ] the administrator or fiduciary discretionary authority...." *Firestone,* 489 U.S. at 114, 109 S.Ct. at 956 (emphasis added). In *Bogue,* the plan directed the plan administrator, in determining whether the participant's new position was "substantially simi\ur," to consider "whether the new position: (i) has compensation and benefits with a value not less than 90% of your current compensation ...; (ii) is located not more than 50 miles from you current work location; and (iii) has responsibilities similar to those of your current position." 750 F.Supp. at 428. Therefore, the *Bogue* plan did no more than include one term—"similar"—that was not self-defining. Because I find that a plan's mere inclusion of such a term is insufficient by itself to vest the plan administrator with discretion, and thereby overcome the presumption of *de novo* review under *Firestone,* I decline to follow *Bogue.*

 Defendant also argues that the Summary Plan Description, which was distributed to Irving employees at the time of the Plan's adoption pursuant to 29 U.S.C. § 1022, provides support for the conclusion that the Plan conferred discretion on Peterson in his capacity as plan administrator. The Summary Plan Description states that, in addition to having general responsibility for administering the Plan and making rules for its operation, the Plan administrator "authorizes payments of benefits [and] *interprets the plan....*" (Kelly Aff.Ex. A) However, a plan summary governs only in limited circumstances, such as where only the plan summary was distributed to employees. *See Heidgerd v. Olin Corp.,* 906 F.2d 903, 907–08 (2d Cir.1990) (summary plan description distributed to

employees pursuant to 29 U.S.C. § 1022 is the employees' primary source of information and controls if in conflict with the terms of the plan). Although a plan summary may expand employees' rights when the summary conflicts with the plan itself, no court has found that a plan summary can expand the plan administrator's authority.

Although the plan summary states that the plan administrator has authority to interpret the Plan, the Plan itself is silent as to the plan administrator's discretionary authority. Because I decline to diminish the rights of plan participants based on the plan summary, especially where the plan summary conflicts with the Plan itself, I find that defendant has failed to prove that the Plan vested Peterson with discretionary authority.

 Therefore, Peterson's determination that plaintiffs did not qualify under the Plan for severance benefits must be reviewed under a *de novo* standard of review. Applying that standard, a host of material issues of fact remain in dispute. In fact, the parties hotly dispute whether plaintiffs' job duties and responsibilities were diminished materially after defendant's takeover of Irving. Therefore, defendant's motion for summary judgment must be denied.

 Moreover, even if the Plan did vest the plan administrator with discretionary authority, material issues of fact would preclude summary judgment. When a plan administrator is vested with discretion to interpret the plan, or to determine eligibility under the plan, courts apply a deferential standard of review to those discretionary determinations by the plan administrator. Prior to *Firestone,* courts almost uniformly applied an arbitrary-and-capricious standard of review. Since *Firestone,* some courts have reviewed plan administrators' discretionary determinations under an abuse-of-discretion standard in reliance on *Firestone*'s statement, in *dictum,* that "[a] trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation

will not be disturbed if reasonable." 489 U.S. at 111, 109 S.Ct. at 954. However, as the Seventh Circuit recently stated, differentiating between the arbitrary-and-capricious standard and the abuse-of-discretion standard requires both a willingness and an ability "to split semantic hairs." *Lister v. Stark,* 942 F.2d 1183, 1188 (7th Cir.1991); *Diroma v. Nat'l Org. of Indus. Trade Unions Ins. Fund,* 1992 WL 123177, at *7, 1992 U.S. Dist. LEXIS 7698, at *9 (S.D.N.Y. May 27, 1992) ("This court finds there is no substantive difference between the two formulations as they relate to the denial of benefits....").

■ In the case at hand, summary judgment must be denied as to Count One under either the arbitrary-and-capricious standard or the abuse-of-discretion standard; under either standard, defendant has failed to show that no material issue of fact exists as to the reasonableness of Peterson's decision to deny plaintiffs' claims for severance benefits. Peterson apparently based his decision on (i) Papageorge's assertion that he was committed to the future of the PFD, and (ii) Tantillo's putative investigation of plaintiffs' claims. However, Tantillo's investigation apparently consisted of discussing plaintiffs' claims with Tenicki, and then accepting Tenicki's assertions at face value.

For instance, Tantillo was asked at his deposition whether, during the course of his investigation of plaintiffs' claims, he had "compare[d] the amount of support that was being provided to Mr. Clark and Snauffer at the time they resigned with the amount of support that was being provided to Mr. Clark and Snauffer as of October '88, when The Bank of New York announced it was taking over Irving Trust Company." (Kelly Aff. Ex. F at 222) Tantillo responded as follows:

I don't recall making that specific comparison.

...

Well, that would be a difficult question to answer, because we don't know who was supporting who.

We know that we had a reduction in the number of people who were in the support group, and we also had a reduction in the number of people who were in the group being supported.

So I couldn't tell you whether we had a higher level or a lower level.

Q. You just don't know?

. . . . .

A. According to Joe Tenicki, the level of support that was being provided was adequate at the time of resignation.

(*Id.* at 224)

Although, defendant now attempts to provide such comparative information, I am bound to review Peterson's determinations based on the record that was before him at the time he decided to deny plaintiffs' claims. *See, e.g., Berry v. Ciba–Geigy Corp.,* 761 F.2d 1003, 1007 (4th Cir.1985) (A court's determination of whether a plan administrator's determination was arbitrary and capricious "required the court to consider only the record before [the plan administrator] at the time he reached his decision."); *Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (6th Cir.1990) (federal court's review of plan administrator's decision is limited to that evidence "presented to the trustee at the time of its final decision").

Peterson's primary basis for denying plaintiffs' claims appears to have been Papageorge's asserted commitment to the PFD and the PFD's market. First, Tantillo's internal memorandum to Peterson recommended that Peterson deny plaintiff's claims because defendant had (1) "a commitment to continue in the healthcare finance business in the not for profit sector," and (2) "a commitment to restaff the function to a level commensurate with the Corporations [*sic*] strategic plan if further resignations occurred." (Second Yeskoo Aff. Ex. F) Second, Peterson's July 24, 1989 letters denying plaintiffs' claims first stated that those claims were being denied because defendant believed that plaintiff's duties had not been diminished materially. (*See Id.* Ex. G) This conclusory statement was explained as follows:

*More specifically,* on April 26, 1989, Mr. Deno D. Papageorge, Sector Head and

SEVP, and Mr. Joseph Tenicki, Department Head and SVP, met with you to discuss your concerns. Mr. Papageorge was there specifically to reassure you of The Bank of New York Inc.'s commitment to continue in the healthcare finance business in the not-for-profit sector. In addition, you were also notified that there was no change in your duties and responsibilities.

Recognizably, the merger has impacted business to the extent that we have had some unanticipated turnover in staffing. However, a further commitment was made to restaff the function to a level commensurate with the corporation's strategic plan if further resignations occurred.

(*Id.* (emphasis added))

However, under the plain terms of the Plan, defendant's commitment to the future of the PFD, sincere or not, may be irrelevant to plaintiffs' claims under that plan. Similarly, whether defendant, at some unspecified future date, intended to restaff the PFD at its pre-takeover level may be irrelevant to the question of whether, at the time plaintiffs submitted their claims under the Plan, plaintiffs' duties and responsibilities had been materially diminished. Section 4.2(a)(iii) of the Plan provides that: "If within two years of a Change in Control a Participant's duties and responsibilities are materially diminished without his consent, he may terminate his employment *within sixty days of the occurrence of such reduction* and be entitled to the Severance Benefits...." (Tantillo Aff. Ex. B (emphasis added)) Therefore, the Plan specifically gives participants a 60–day window in which to submit claims for severance benefits based on a material diminution in the claiming participant's job duties and responsibilities. That window would be meaningless if defendant could defeat any claim under § 4.2(a)(iii) simply by expressing an intention to re-expand the claiming employee's duties and responsibilities to a pre-diminution level. Of course, the Plan should not be read to permit an employee to claim severance benefits based on what is demonstrably a temporary diminution of duties. But the real-

istic duration of any such alleged diminution here presents fact issues that cannot be resolved summarily.

■ Finally, if a plan confers discretion on a plan "administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor[ ] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115, 109 S.Ct. at 956–57 (brackets in original) (quoting *Restatement (Second) of Trusts* § 187, Comment d (1959)). In the case at hand, Peterson acted as both the plan administrator and the head of the Bank's personnel department. In such a dual capacity, he had an undeniable conflict of interest between his loyalties to his employer, who had an economic interest in minimizing its obligations under the Plan, and his fiduciary obligations to plan participants. *Cf. Arthurs*, 760 F.Supp. at 1098 (conflict of interest exists where "the plan administrator is also the party responsible for paying the benefits at issue").

■ Defendant argues that Peterson had no conflict of interest because Manufacturers Hanover reviewed defendant's denials of claims under the Plan. However, Manufacturers Hanover was trustee of the Irving Trust Corporation Benefits Protection Trust, not of the Plan. As trustee, Manufacturers Hanover was responsible for funding litigation brought by claimants whose claims under the Plan had been denied; Manufacturers Hanover had no authority to overrule Peterson's decisions regarding claims under the Plan. Therefore, Manufacturers Hanover's role as trustee of the Benefits Protection Trust does not eliminate Peterson's conflict of interest, and his conflict of interest thus must be considered in determining whether he abused his discretion, or acted arbitrarily and capriciously in denying plaintiffs' claims.

For the above reasons, defendant's motion for summary judgment as to Count One must be denied even under the arbitrary-and-capricious standard or the abuse-of-discretion standard. Considering the limited scope of Tantillo's investigation into plaintiffs' claims and the seemingly limited

scope of the record before Peterson at the time he denied plaintiffs' claims, as well as Peterson's conflict of interest and mistaken emphasis on the Bank's purported intentions as to the future of the PFD, *and* drawing all inferences against defendant and in favor of plaintiffs, it is simply impossible to find that no material issue of fact remains in dispute as to this Count. However, the discretionary determinations of plan administrators are given great deference under both the arbitrary-and-capricious and the abuse-of-discretion standards, *see, e.g., Lister,* 942 F.2d at 1188, and my determination here is not intended to express any opinion as to the likelihood that plaintiffs ultimately would be able to prove that Peterson's decision to deny to their claims was in fact arbitrary and capricious or an abuse of discretion.

## V.

Defendant moves for summary judgment as to Counts Two, Three, and Four on the ground that those counts are preempted by ERISA. In response to defendant's acknowledgment that the Plan is a qualified ERISA plan, plaintiffs have conceded that Count Two is preempted. (Pl. Mem. at 23) However, they maintain that Counts Three and Four are not.

"[T]he express preemption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45–46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (quoting *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981)). Section 514(a) of ERISA preempts "any and all State laws insofar as they may now or

hereafter relate to any employee benefit plan...." [1] 29 U.S.C. § 1144(a).

The Supreme Court has found that the phrase "relate to any employee benefit plan" has "'its broad common-sense meaning, such that a state law "relates to" a benefit plan "in its normal sense of the phrase, if it has a connection with or reference to such a plan."'" *Pilot Life Ins.,* 481 U.S. at 47, 107 S.Ct. at 1553 (quoting *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983))). In addition, the Court has held that "the preemption clause is not limited to 'state laws specifically designed to affect employee benefit plans,'" *Pilot Life Ins.,* 481 U.S. at 47–48, 107 S.Ct. at 1553 (quoting *Shaw,* 463 U.S. at 98, 103 S.Ct. at 2900); rather, ERISA also preempts state statutes of general application and state common-law causes of action.[2] *See Id.; see also Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).

### A. Count Three

In Count Three of the Complaint, plaintiffs seek reliance damages for alleged misrepresentations by defendant. According to plaintiffs, defendant represented to them "that it would not diminish their responsibilities and that it would honor the Plan." (Compl. ¶ 21) Plaintiffs allege that defendant breached these representations by "(1) almost immediately diminishing plaintiffs' employment responsibilities; and (2) not honoring its obligations under the Plan." (*Id.* ¶ 24)

---

1. State laws are defined to include "all laws, decisions, rules, regulations or other State action having the effect of law...." 29 U.S.C. § 1144(c)(1).

2. Plaintiffs seek to define the § 514(a)'s "relate to" phrase according "exist[ing] where a state law prescribes either the type and amount of an employer's contributions to a plan, the rules and regulations under which the plan operates or the nature and amount of the benefits provided thereunder." *Gen. Electric Co. v. New York State Dep't of Labor,* 891 F.2d 25, 29 (2d Cir.

1989), *cert. denied,* 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990). However, *Gen. Electric* is inapposite because it addressed state statutes that directly regulated pension plans and not state laws of general application. Moreover, as the Second Circuit recently stated, "a state law of general application, with only an indirect effect on a pension plan, may nevertheless be considered to 'relate to' that plan for preemption purposes." *Smith v. Dunham–Bush, Inc.* 959 F.2d 6, 9 (2d Cir.1992) (citing *Shaw,* 463 U.S. at 97, 103 S.Ct. at 2900).

This claim is preempted by ERISA because it simply reiterates plaintiffs' ERISA claims in the guise of a state common-law cause of action. Like plaintiffs' ERISA claims, their misrepresentation claims turn on (i) their allegedly diminished post-takeover duties and responsibilities and (ii) defendant's alleged failure to honor the terms of the Plan, *i.e.*, to compensate plaintiffs under the Plan for those alleged job diminishments.

It would be perverse to allow plaintiffs to circumvent ERISA's comprehensive statutory framework by supplementing the damages available under ERISA with state-law penalties for the identical conduct. Moreover, if Count Three were not preempted, plan participants could sue for misrepresentation in state court and then use collateral estoppel offensively in a federal ERISA action alleging the identical conduct. This would undermine Congress's intention to "abate the potential for employers to reduce benefits or to refrain from adopting such plans for fear of being subject to frequent and inconsistent state law challenges," *Smith v. Dunham–Bush, Inc.* 959 F.2d 6, 8–9 (2d Cir.1992), and would eviscerate Congress's intention that ERISA " 'establish pension plan regulation as exclusively a federal concern.' " *Pilot Life Ins.*, 481 U.S. at 45–46, 107 S.Ct. at 1552 (quoting *Alessi*, 451 U.S. at 523, 101 S.Ct. at 1906).

### B. Count Four

■ In Count Four, plaintiffs seek damages for defendant's alleged breach of its fiduciary duty. Plaintiffs claim that defendant "has breached its duty not to interfere with the administration of the Plan by directing Manufacturers Hanover Trust Company not to pay plaintiffs their benefits." (Compl. ¶ 28)

This claim is preempted because ERISA prescribes a fiduciary's duties with respect to an ERISA plan. *See* 29 U.S.C. § 1104. As the Supreme Court found in *Ingersoll–Rand,* plaintiffs' cause of action "purports to provide a remedy for the violation of a right expressly guaranteed by an ERISA

cause of action and is thus preempted." —— U.S. ——, 111 S.Ct. at 486.

Plaintiffs belatedly argue that this claim is not preempted because it "is not related to the Irving Separation Policy. Rather, the claim is that The Bank of New York interfered with Manufacturers Hanover's administration of a separate benefits trust, a trust being administered by Manufacturers Hanover for the benefit of former employees of Irving." (Pl. Mem. at 24–25) However, defendant had no fiduciary responsibility under that trust, the Separation Benefits Trust, except insofar as it related to the Plan. Therefore, Count Four is preempted by ERISA.

### VI.

■ Defendant moves to dismiss Clark's and Snauffer's claims pursuant to Fed.R.Civ.P. 37, which provides sanctions for a party's failure to cooperate in discovery. Defendant claims that such sanctions are appropriate here because Clark and Snauffer gave "intentionally false, misleading and evasive answers during their depositions in this action." (Def. Mem. at 18)

Defendant claims that inconsistencies between Clark's and Snauffer's respective bank telephone records and their respective deposition testimony show that Clark and Snauffer gave false deposition testimony about their respective pre-resignation job searches. However, as plaintiffs detail in their Opposition Memorandum, Clark's and Snauffer's deposition testimony can be reconciled—at least technically—with their respective telephone records. Moreover, by having omitted any reference to its Rule 37 motion from its Reply Memorandum, defendant appears to concede as much. Accordingly, defendant's motion to dismiss Clark's and Snauffer's claims pursuant to Rule 37 is denied.

### VII.

■ Plaintiffs cross-move pursuant to Rule 19, Fed.R.Civ.P., to add "Frank Peterson, as Administrator of the Irving Bank Corporation Separation Policy" as a named defendant. They assert that under arguably applicable Second Circuit case law,

Peterson is a necessary party. Therefore, they claim that, "The addition [of Peterson] serves the interests of justice in preventing prejudice to plaintiffs should the Bank later choose to argue that the plan administrator was a necessary party." (Pl. Mem. at 34)

In its Reply Memorandum, defendant "stipulates that it will not argue in this litigation that the Plan administrator is a necessary party...." (Def. Rep. Mem. at 60) However, apparently plaintiffs' proffered reason for moving to add Peterson as a named party was disingenuous because even that stipulation by defendant has not satisfied plaintiffs.

In their Surreply, plaintiffs argue that they should be permitted to add Frank Peterson as a named party "unless Frank Peterson, on behalf of the plan, agrees to be bound by any determination made in this litigation. Plaintiffs submit that anything short of this agreement does not adequately protect their interests." (Pl. Surrep. Mem. at 3)

However, having been given what they initially requested, plaintiffs may not use that as an embarkation point for a fishing expedition. Moreover, plaintiffs themselves assert that, "Since the separation policy is an unfunded plan, and any award must be paid by The Bank of New York, its interests are identical to those of the plan administrator." (Pl. Mem. at 34) Accordingly, plaintiffs' cross-motion to add Peterson as a named defendant is frivolous and is denied.

### VIII.

Although discovery already has been completed, plaintiffs cross-move to require production of Tenicki's 1988 and 1989 telephone records at the Bank. Plaintiffs claim that they should have access to these records because "[p]laintiffs have testified that after the takeover Tenicki told them that there was no future for them at the Bank, that they should seek other employment, and that Tenicki only later cast in his lot with The Bank of New York after presumably an unsuccessful job search." (Pl. Surrep. Mem. at 24–25) Tenicki apparently denies that he ever made those statements

or looked for another job prior to plaintiffs' resignations. (*See Id.*)

Plaintiffs, therefore, must seek Tenicki's telephone records (i) to impeach his claim that he was not looking for a new job during 1988 and 1989, and (ii) to discredit defendant's argument that plaintiffs were denied separation benefits because they were seeking other employment before and during the period of their allegedly diminished responsibility.

However, whether Tenicki was seeking other employment during 1988 and/or 1989 does not go to the underlying issues in the case at hand, namely whether plaintiffs' duties and responsibilities were diminished after the Bank took over Irving. Therefore, at best, Tenicki's telephone records would provide impeaching evidence on a collateral issue. That, however, is an insufficient basis for reopening discovery at this late date. Accordingly, plaintiffs' motion to discover Tenicki's telephone records is denied.

### IX.

Plaintiff Snauffer moves for partial summary judgment as to Count One of the Complaint, arguing that an error in defendant's July 24, 1989 letter denying Snauffer's claim for severance benefits should give rise to substantive rights under the Plan. Specifically, Snauffer argues that his claim for benefits under the Plan should be granted on this motion for summary judgment because the July 24 letter stated that Snauffer had been given certain information at the April 26, 1989 meeting with Papageorge, Tenicki, and Tantillo, when in fact Snauffer did not attend that meeting.

ERISA requires that an employee, whose claim for benefits under the plan has been denied, receive "adequate notice in writing ... setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant...." 29 U.S.C. § 1133. The Second Circuit has held that,

Where violations of ERISA disclosure provisions work a "substantive harm" on

plaintiffs who are denied benefits under the improperly disclosed plan, courts may find these violations "sufficiently taint [the employer's] denial of severance pay so as to warrant a finding that [the denial] was arbitrary and capricious" and grant the benefits. *Veilleux v. Atochem North Am. Inc.*, 929 F.2d 74, 76 (2d Cir.1991) (per curiam) (quoting *Gilbert v. Burlington Indus., Inc.*, 765 F.2d 320, 328–29 (2d Cir.1985), *aff'd*, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986)). Snauffer has attempted to piggyback *Firestone* onto *Gilbert* and *Veilleux*, arguing that a court no longer need find that the procedural violation was sufficiently egregious to render the denial of benefits arbitrary and capricious. Rather, pursuing a theory that Snauffer has conceded presents a question of first impression, he would have me find that defendant's procedural error sufficiently tainted defendant's denial of Snauffer's claim for severance benefits so as to require summary judgment under a *de novo* standard of review. However, because Snauffer's innovative theory misconstrues the principle underlying *Gilbert* and *Veilleux*, namely that the procedural violations at issue in those cases were deemed to be arbitrary and capricious because they worked substantive harms. Therefore, even under a *de novo* standard of review, the procedural error would have to cause substantive harm before that harm could be deemed to give rise to a substantive right. Because Snauffer has not proffered any evidence that he was prejudiced in any way by defendant's procedural error, his claim for partial summary judgment fails under both the traditional arbitrary-and-capricious standard as well as the *de novo* standard of review.

Finally, Snauffer argues that defendant should be bound to show that Peterson's decision was reasonable based on his proffered reasons for that decision. Snauffer is correct to the extent that the record before Peterson at the time of his decision cannot be reopened and supplemented for purposes of this litigation, and to the extent that Peterson's proffered reasons for his decision go to the reasonableness of that decision. However, that does not mean that Peterson's mistaken inclusion of Snauffer at the April 26, 1989 meeting with Papageorge automatically proves that Peterson's decision to deny Snauffer's claims was arbitrary and capricious or an abuse of discretion. In arguing that that mistake should give rise to substantive rights, Snauffer disregards the controlling fact present in *Gilbert* and *Veilleux*, namely that a procedural error worked a substantive harm. Therefore, Snauffer's motion for summary judgment as to Count One is denied.

## X.

Plaintiff Clark moves to disqualify SSS & G as defendant's counsel because SSS & G previously represented him in three real estate transactions. First, in 1986, SSS & G represented Clark when he purchased a cooperative apartment at Three Hanover Square, New York, New York. (Clark Aff. ¶ 2) Second, in 1988, SSS & G represented Clark when he refinanced the Three Hanover Square cooperative apartment. (*Id.* ¶ 3) Third, in 1991, SSS & G represented Clark when he purchased a condominium at 392 Central Park West, New York, New York. (*Id.* ¶ 4)

Clark argues that his attorney-client relationship with SSS & G provides two bases for disqualifying SSS & G as defendant's counsel in the case at hand: (1) "the 1986 and 1988 representations are substantially related to issues in this case"; and (2) "the 1991 representation overlapped with Saiber Schlesinger's adverse appearance in this case, creating the appearance of impropriety." (Pl. Disqualification Mem. at 2)

Motions to disqualify opposing counsel are viewed with disfavor in this Circuit because they are "often interposed for tactical reasons" and result in unnecessary delay. *United States Football League v. National Football League*, 605 F.Supp. 1448, 1452 (S.D.N.Y.1985) (collecting cases). The Second Circuit has "indeed been loathe [*sic*] to separate a client from his chosen attorney.... The delay and additional expense created by substitution of counsel is a factor to which [it has]

attached considerable significance...." *In re Bohack Corp.*, 607 F.2d 258, 263 (2d Cir.1979). Thus, although doubts should be resolved in favor of disqualification, *Cheng v. GAF Corp.*, 631 F.2d 1052, 1059 (2d Cir.1980), *vacated on other grounds and remanded*, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981), the party seeking disqualification must carry a "heavy burden," *Vegetable Kingdom, Inc. v. Katzen*, 653 F.Supp. 917, 922 (N.D.N.Y.1987), and must meet a "high standard of proof" before a lawyer is disqualified. *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir.1983) (citing *Government of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir.1978)); *Twin Laboratories, Inc. v. Weider Health & Fitness*, 1989 WL 49368, at *3, 1989 U.S. Dist. LEXIS 4693, at *11 (S.D.N.Y. May 1989).

## A. Substantial Relationship

■ Generally, an attorney may not knowingly reveal a client confidence if to do so would disadvantage that client. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227 n. 2 (2d Cir.1977); *see also* Model Code of Professional Responsibility EC 4–5, 4–6 (1980) ("A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client...."); "The obligation of a lawyer to preserve the confidences and secrets of his client continues after the termination of his employment."). Therefore, the Model Rules of Professional Conduct prescribe that "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client...." *See* Model Rules of Professional Conduct 1.9(a) (1983). Among other reasons, this model rule was designed to "give the court confidence that a lawyer will not use unfairly the secrets gained in prior employment." *Twin Laboratories*, 1989 WL 49368, at *2, 1989 U.S. Dist. LEXIS 4693, at *7.

This Circuit has reviewed attorney disqualification motions under Canon 4 of the Model Code of Professional Responsibility. *See, e.g., Cheng*, 631 F.2d at 1059; *NCK*

*Org. Ltd. v. Bregman*, 542 F.2d 128, 129 n. 2 (2d Cir.1976). Under Canon 4, courts apply a three-part test to determine whether an attorney should be disqualified:

(1) is the moving party a former client of the adverse party's counsel;

(2) is there a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present suit; and

(3) did the attorney whose disqualification is sought have access to, or was he likely to have had access to, relevant privileged information in the course of his prior representation of the client?

*See Evans*, 715 F.2d at 791 (citing *Cheng*, 631 F.2d at 1059); *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 570–71 (2d Cir.1973); *Keoseian v. Von Kaulbach*, 707 F.Supp. 150, 151 (S.D.N.Y.1989); *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F.Supp. 265, 268 (S.D.N.Y.1953) (Weinfeld, J.).

When applying this test, courts must look with "painstaking" care at the facts, *United States v. Standard Oil Co.*, 136 F.Supp. 345, 367 (S.D.N.Y.1955), maintaining a balance between a party's right to preferred counsel and the need to "preserve the integrity of the adversary process." *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979). *Cf. Emle*, 478 F.2d at 564–65 (referring to the "need to maintain the public's trust in the integrity of the Bar").

### 1. *Attorney Client Relationship*

The first element of the test for disqualification requires Clark to demonstrate that he formerly was a client of SSS & G. Gerald P. Seid, a corporate and real estate attorney at SSS & G—with the assistance of Mary E. Burgwinkle, Esq., who was an associate at SSS & G at that time—handled the 1986 and 1988 Three Hanover Square transactions for Clark. (Seid Aff. ¶¶ 1, 2, 4) As a result of SSS & G's representation of Clark on those matters, Clark undeni-

ably has established this first element of the substantial similarity test.

### 2. *Substantial Relation*

■ This Circuit has applied the "substantially related" prong strictly, requiring the moving party to demonstrate that the relationship between the two actions is "patently clear," or that the actions are "identical" or "essentially the same." *Government of India v. Cook Indus., Inc.*, 569 F.2d 737, 740 (2d Cir.1978) (disqualifying attorney because he had learned during prior representation about plaintiff's lading procedures, which were in question in instant representation). *Cf. Emle*, 478 F.2d at 571 (disqualifying plaintiffs' attorney who had previously represented defendants because both actions dealt with nature and scope of Burlington's control of Pantentex).

In the case at hand, Clark argues that SSS & G's representation of him in 1986 and 1988 is substantially related to the case at hand (i) because it goes to Clark's credibility as to Count One, and (ii) because it goes to damages under Count Three. (Pl. Disqualification Mem. at 3–5) Because I have granted defendant's summary judgment motion as to Count Three, I need not address the latter of these arguments.

As to the former, Clark contends that the 1988 refinancing transaction relates "to a key credibility issue in this case" because defendant, in its motion for summary judgment, has argued that Clark resigned in order to take another job in Chicago, and not because his duties and responsibilities at the Bank had diminished. (Pl. Disqualification Mem. at 4) According to Clark, SSS & G should be disqualified because SSS & G "will be called upon to cross examine Mr. Clark about his reasons for hiring Saiber Schlesinger to represent him in the October 1988 refinancing...." (*Id.* at 5)

However, Clark has failed to show that his reasons for refinancing his Hanover Square cooperative apartment, much less the actual substance of the refinancing, are substantially related to the case at hand. Clark could have refinanced that apartment for a variety reasons unrelated to his inten-

tions regarding his job at the Bank. Therefore, at most, the substance of Clark's 1988 relationship with SSS & G goes to a collateral credibility issue; certainly, the relationship between the substance of the 1988 attorney-client relationship and the present action is not "patently clear," nor are the two actions "identical" or "essentially the same." *Government of India*, 569 F.2d at 740.

### 3. *Access to Confidential Information*

■ As to this third prong, the Second Circuit has looked to whether the disputed attorney's involvement in the prior case "was such that he would have had access to relevant privileged information." *Government of India*, 569 F.2d at 740. Because Clark has failed to satisfy the substantial relation prong, I address this third prong only briefly.

Although defendant argues that Clark shared no confidences with SSS & G, the attorney client relationship between Seid and Burgwinkle, and Clark, established under the first prong of the disqualification test, requires me to assume that Seid and Burgwinkle had access to confidential information. As the Second Circuit has held:

> It is well established that a court may not inquire into the nature of the confidences alleged to have been revealed to the tainted attorney. To require proof of access to privileged information would "put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether."

*Cheng*, 631 F.2d at 1056 (quoting *Government of India*, 569 F.2d at 740).

Because Seid and Burgwinkle had access to confidential information, that access is likewise imputed to all members of SSS & G. Disciplinary Rule 5–106(D) of the Code of Professional Responsibility provides: "If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such em-

ployment." *Accord* Rules of Professional Conduct Rule 1.10(a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited form doing so by Rule[ ] ... 1.9...."); *see also Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d 706, 710 (7th Cir.1976); *Westinghouse Electric Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311, 1318 (7th Cir. 1978).

However, because Clark has failed to prove that there is a substantial relationship between SSS & G's prior representation of him and the current action, his motion to disqualify SSS & G on the basis of that alleged similarity is denied.

**B. Simultaneous Representation**

■ Ethical Consideration 5–1 of the Code of Professional Responsibility requires that, "The professional judgment of a lawyer should be exercised ... solely for the benefit of his client and free from compromising influences and loyalties." A corollary of this prescription is Ethical Consideration 5–14's proscription of a lawyer's "acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client." In *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir.1976), the Second Circuit held that, pursuant to these Ethical Considerations, it is prima facie improper for a lawyer to undertake employment against an existing client. In order to rebut that prima facie impropriety, the lawyer whose disqualification is sought must show, "at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation." *Id.* at 1387 (emphasis in original).

Clark argues that Canon 5 and *Cinema 5, Ltd.* require SSS & G's disqualification because SSS & G still represented him with respect to the 1991 closing on his purchase of the Central Park West condominium at the time it began representing defendant in the case at hand. The closing on Clark's Central Park West condominium took place on March 4, 1991, and Clark received his closing book and paid SSS & G in April

1991. (Clark Aff. ¶ 4) Clark avers that he last spoke with SSS & G in April or May of 1991. (*Id.*)

However, Clark argues that SSS & G continued to represent him past that time. He asserts that he "spoke with Saiber, Schlesinger in April or May, 1991 about a dispute with the lending bank [East River Savings Bank] over ongoing escrow payments and was advised not to pay the claimed escrow charge." (*Id.*) Moreover, he claims to have told "Saiber Schlesinger that [he] would talk to the bank and get back to [SSS & G] if [he] was unable to resolve the issue." Allegedly, that issue—the dispute with East River Savings Bank—still has not been resolved. (Clark Rep. Aff. ¶¶ 2–3)

By contrast, defendant unequivocally denies that it continued to represent Clark past April or May, 1991. Alice M. Stinebaugh, Esq., under Seid's supervision, handled the 1991 closing on the Central Park West condominium for Clark. She claims that, in late March, 1991, Clark discussed with her "an issue concerning a security deposit he had in escrow with the landlord when he was a tenant prior to conversion." (Stinebaugh Aff. ¶ 5) Stinebaugh further asserts that:

> In late April 1991, Clark called me and questioned the amount of disbursements on SSS & G's bill for the closing.... At that time, he told me that he would resolve the security deposit [escrow] issue by himself. He further indicated that he certainly was not going to pay any more for the closing. At that time, I fully understood our representation to be concluded and, pursuant to Clark's instructions, neither I nor anyone else at SSS & G had any conversations or performed any further services concerning the escrow issue or any other matters on his behalf.

(Stinebaugh Aff. ¶ 5) Moreover, SSS & G claims that defendant did not contact it about the case at hand until mid-June of 1991, almost two months after defendant alleges SSS & G completed its representation of Clark.

As is evident from the foregoing, the affidavits of the parties regarding SSS & G's representation of Clark on the 1991 closing are irreconcilable, and the supporting documents neither prove nor disprove definitively plaintiff's or defendant's allegations. Therefore, a hearing is necessary in order to determine whether SSS & G still represented Clark at the time it began representing defendant in this case. Accordingly, decision on this portion of Clark's motion to disqualify SSS & G will await the outcome of such a hearing.

### XI.

Defendant moves for sanctions pursuant to Rule 11, Fed.R.Civ.P., and 28 U.S.C. § 1927, claiming that plaintiffs' disqualification motion is frivolous. Because I am withholding judgment on that portion of Clark's disqualification motion relating to SSS & G's allegedly contemporaneous representation of Clark and the Bank, efficiency counsels that I also withhold judgment on defendant's sanctions motions until I have decided Clark's disqualification motion in its entirety.

\* \* \* \* \* \*

For the above reasons, defendant's motion for summary judgment as to Count One is denied, as is defendant's motion to dismiss Clark's and Vincent's claims pursuant to Fed.R.Civ.P. 37; however, defendant's motion for summary judgment as to Counts Two, Three, and Four is granted. Plaintiffs' cross-motions are denied in their entirety, except as to that portion of Clark's disqualification motion that relates to SSS & G's 1991 representation of him, on which a hearing is to be held. Lastly, I will withhold judgment on defendant's motion for sanctions until I have decided both portions of Clark's disqualification motion.

SO ORDERED.