Terri L. OLSON, Plaintiff,

v.

COMFORT SYSTEMS USA SHORT TERM DISABILITY PLAN, Comfort Systems USA Long Term Disability Plan and the Prudential Insurance Company of America, Defendants.

No. 05–C–225–C.

United States District Court, W.D. Wisconsin.

Dec. 30, 2005.

Robert A. Mich, Jr., for Plaintiff.

Amy O. Bruchs, Michael Best & Friedrich, LLP, Madison, WI, for Defendants.

## OPINION and ORDER

CRABB, District Judge.

This is a civil suit for monetary relief arising under the Employee Income Retirement Security Act (ERISA), 29 U.S.C. §§ 1001–1461, in which plaintiff Terri Olson contends that defendant Prudential Insurance Company of America wrongfully denied her application for benefits under short and long term disability plans sponsored by her employer, Comfort Systems USA, Inc. 29 U.S.C. § 1132(a)(1)(B). Subject matter jurisdiction is present. 28 U.S.C. § 1331.

This case is before the court on cross motions for summary judgment filed by the parties. For the reasons stated below, I will grant defendants' motion for summary judgment and deny plaintiff's motion. Although I review defendant Prudential's decision to deny benefits de novo, I find that its conclusion was correct. The evidence in the record is insufficient to show that plaintiff's multiple conditions rendered her unable to perform the material and substantial duties of her job.

From the parties' proposed findings of fact and the record, I find the following to be material and undisputed.

## UNDISPUTED FACTS

### A. *Parties*

At all times relevant, plaintiff Terri Olson was an adult resident of Stoughton, Wisconsin and an employee of Comfort Systems USA, Inc. Defendants Comfort Systems USA Short Term Disability Plan (short term disability plan) and Comfort Systems USA Long Term Disability Plan (long term disability plan) are employee

disability plans that provide benefits to employees of Comfort Systems USA, Inc. in Wisconsin. Defendant Prudential Insurance Company of America (Prudential) is a corporation formed under the laws of New Jersey with its principal place of business in Newark, New Jersey. At all times relevant, defendant Prudential was engaged in the business of underwriting insurance maintained by employers as part of employee welfare benefit plans. Defendant Prudential serves as the claims administrator for Comfort Systems' short term and long term disability plans. It also funds the benefits under the long term disability plan. (From this point forward, all references to defendant will be to Prudential). Comfort Systems USA, Inc. self-funds benefits under the short term disability plan.

B. *The Short Term Disability Plan*

In order to be eligible to receive benefits under Comfort Systems USA's 2003 and 2004 short term disability plans, an employee's physical condition had to satisfy the following definition of "disability":

> You, because of injury or illness, are (1) continuously unable to perform all the substantial and material duties of Your own occupation due to injury or Sickness. Total disability must begin while You are covered under this program; (2) under the regular care of a licensed physician other than Yourself; and (3) not gainfully employed in any occupation for which You are or become qualified, by education, training or experience.

The short term disability plan has a two-week elimination period, after which benefits are recoverable from the third through the twenty-sixth week of disability. The short term disability plan's summary plan description states that

> Claims Administration for benefits under your Employer's ERISA plan is provided by The Prudential Insurance Company of America. The Prudential Insurance Company of America as Claims Administrator has been delegated the responsibility to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits.

The only substantive change between the summary plan descriptions for the 2003 and 2004 short term disability plans was the elimination of a graduated percentage scale of benefits and replacement with a flat 60% benefit rate.

C. *The Long Term Disability Plan*

To be eligible to receive benefits under Comfort Systems USA's long term disability plan, an employee must meet the following definition of "disability":

> You are disabled when Prudential determines that:
>
> 1) You are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> 2) You have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.
>
> After 24 months or payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.
>
> The loss of a professional or occupation license or certification does not, in itself, constitute disability.
>
> We may require you to be examined by doctors, other medical practitioners or vocational experts of our choice. Prudential will pay for these examinations. We can require examinations as often as it is reasonable to do so. We may also require you to be interviewed by an

authorized Prudential Representative. Refusal to be examined or interviewed may result in denial or termination of your claim.

"Material and substantial" duties are those that

are normally required for the performance of your regular occupation; and cannot be reasonably omitted and modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

The long term disability plan defines "regular occupation" as

the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer at a specific location.

It defines "gainful occupation" as

an occupation, including self employment, that is or can be expected to provide you with an income equal to at least 60% of you[r] indexed monthly earnings within 12 months of your return to work.

Sickness means any disorder of your body or mind, but not an injury; pregnancy including abortion, miscarriage or childbirth. Disability must begin while you are covered under the plan.

Injury means a bodily injury that is the direct result of an accident and not related to any other cause. Injury which occurs before you are covered under the plan will be treated as a sickness. Disability must begin while you are covered under the plan.

In addition, under the long term disability plan:

You must be continuously disabled through your elimination period. Prudential will treat your disability as continuous if your disability stops for 30 days or less during your elimination period. The days that you are not disabled will not count toward your elimination period.

Your elimination period is 180 days.

"Elimination period" is defined as "a period of continuous disability which must be satisfied before you are eligible to receive benefits from Prudential." Certain disabilities have a limited pay period under the long term disability plan:

Disabilities due to sickness or injury which, as determined by Prudential, are primarily based on self-reported symptoms have a limited pay period during your lifetime.

Disabilities which, as determined by Prudential, are due in whole or part to mental illness also have a limited pay period during your lifetime.

The limited pay period for self-reported symptoms and mental illness combined is 24 months during your lifetime.

\*　　\*　　\*　　\*　　\*　　\*

Self-reported symptoms means the manifestation of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

Mental illness means a psychiatric or psychological condition regardless of cause. Mental illness includes but is not limited to schizophrenia, depression, manic depressive or bipolar illness, anxiety, somatization, substance related disorders and/or adjustment disorders or

other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine.

The long term disability plan does not contain any language granting discretion to the plan administrator to determine whether an applicant is entitled to benefits. However, the plan's summary plan description provides:

This booklet is intended to comply with the disclosure requirements of the regulations issued by the U.S. Department of Labor under the Employee Retirement Income Security Act (ERISA) of 1974. ERISA requires that you be given a "Summary Plan Description" which describes the plan and informs you of your rights under it.

This Group Contract underwritten by The Prudential Insurance Company of America provides insured benefits under your Employer's ERISA plan(s). The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious.

## C. *Plaintiff's Application for Benefits*

Comfort Systems USA, Inc. has employed plaintiff since 1989. During this time, she has been covered under Comfort Systems USA's short term and long term disability plans. At the time plaintiff filed an application for disability benefits, she was working as an estimator. In that capacity, her job duties included analyzing blueprints, specifications, proposals and other documents and preparing time, cost and labor estimates for prospective jobs. (In various documents submitted by plaintiff, her treating physician and Comfort Systems USA, plaintiff's job is described as "sedentary" or as involving lifting light amounts of weight. In labeling plaintiff's job as "sedentary," defendant took into account only the various physical requirements of the job, such as lifting, carrying, pushing/pulling, handling, reaching and hearing.)

In 2001, Dr. James Giesen, who has been plaintiff's treating physician for over five years, diagnosed plaintiff with a number of ailments including fibromyalgia, myofascial pain syndrome, chronic pain syndrome, chronic fatigue syndrome, interstitial cystitis, short term memory loss, carpal tunnel syndrome, irritable bowel syndrome, hypertension, high cholesterol, migraine headaches and tennis elbow.

On August 1, 2003, plaintiff stopped working and submitted a claim for benefits under the short term disability plan. At that time, she was experiencing high blood pressure, migraine headaches and symptoms of other conditions including irritable bowel syndrome, chronic fatigue syndrome, carpal tunnel syndrome, tennis elbow and fibromyalgia. As part of her benefits application, plaintiff submitted an employee statement in which she listed Dr. Giesen as her primary care physician. Also, she indicated that she had been treated for these conditions for the first time on January 1, 2001 and that these conditions caused her constant pain, made her tired and prevented her from concentrating at work. Another part of her application was a physician's statement signed by Dr. Giesen and dated August 10, 2003. According to this statement, plaintiff received a primary diagnosis of fibromyalgia and chronic pain and a secondary diagnosis of neuromyopathy and "migraine HAS." Dr. Giesen set plaintiff's return to

work date at October 1, 2003 and noted that she "should be able to return to regular duties" at that time.

By letter dated August 25, 2003, defendant notified plaintiff that it had decided to deny her claim for short term disability benefits. According to the letter, defendant came to this decision after determining that plaintiff's condition did not qualify as a "disability" under the terms of the short term disability plan because it would not prevent her from performing the material and substantial duties of her job. Defendant stated further that, although plaintiff experienced symptoms that required medical treatment, the medical documentation she had provided did not indicate any changes in her chronic conditions that would prevent her from performing her job duties.

### D. *Plaintiff's First Appeal*

On September 22, 2003, plaintiff appealed the denial of her claim. In her letter of appeal, she stated that Dr. Giesen had approved her work stoppage in August 2003 "to break the flare up" that plaintiff had been experiencing for the past two years. She indicated further that she needed physical therapy to learn techniques to prevent her body from tightening up.

Plaintiff submitted additional medical records with her appeal. They contained the following information. First, plaintiff was diagnosed with fibromyalgia in August 2001. Second, after an office visit on October 11, 2002, Dr. Giesen wrote that plaintiff was functional on a regimen of narcotics and that her migraine headaches were responsive to medication. However, during the office visit, Dr. Giesen spoke with plaintiff about his concern that she was becoming increasingly dependent on the narcotics she was taking. A note from Dr. Giesen dated June 23, 2003, indicated that he had referred plaintiff to Gateway Reha-

bilitation to address concerns of narcotic dependence. In addition, the medical records submitted by plaintiff indicated that she had been treated for interstitial cystitis syndrome since August 2001 and that her urethra was dilated occasionally to make it easier for her to pass urine, although this process could cause some bleeding.

Despite her ailments, plaintiff attempted to return to work but was unable to do so for more than two weeks. On October 22, 2003, Dr. Giesen wrote the following:

Terri Olson has been under my continuing care for severe fibromyalgia, memory loss, fatigue, and chronic pain. She had been off work because of complications of her illness and returned to work on October 6. She was able to remain working until October 20 when it was clear that many of the problems that led to her initial disability have persisted. She continues to have significant memory loss, fatigue, and tiredness aggravated by work and exacerbation of her chronic pain. She also has a history of carpal tunnel and is scheduled for carpal tunnel repair on Monday, October 27, 2003. She needs to be out of work completely until re-evaluated in 6 weeks, which will be the end of November.

Defendant sent plaintiff a letter dated November 5, 2003 informing her that it was upholding its decision to deny her claim for short term disability benefits. After reviewing the medical records submitted by plaintiff, defendant concluded that (1) she had complained of fibromyalgia since at least May 2001; (2) her laboratory findings had been within normal limits; (3) the x-rays of her neck, back and hips revealed nothing remarkable; and (4) the clinical examinations of plaintiff revealed no abnormal swelling or synovitis of the joints. The records indicated further that plaintiff had been taking significant

medications while working. Defendant noted also that although plaintiff had complained of fatigue, she had been able to maintain her activities of daily living and was able to attend scheduled doctor visits. It concluded that plaintiff's interstitial cystitis was not an ongoing impairment but rather one that could be addressed with a procedure that would only required her to take one day off work. With respect to plaintiff's carpal tunnel syndrome, defendant noted that it had not been given the results of an electromyrogram/nerve condition study that plaintiff's medical records indicated had been performed and that plaintiff was not wearing the night splints she had been given. Finally, defendant stated that plaintiff had been diagnosed with irritable bowel syndrome ten years earlier but that her medical records did not show that she had received any recent treatment for it.

Defendant determined that the medical records submitted by plaintiff did not disclose the existence of a physical impairment that would prevent plaintiff from performing the essential duties of her job. It noted that there was no evidence of a significant change in any of plaintiff's impairments and that plaintiff had been working with these conditions for a few years. Although plaintiff indicated that she experienced pain, there were no findings to support the severity of her subjective reports. Defendant noted that plaintiff could attend physical therapy as needed, before and after her working hours.

An internal memorandum dated November 3, 2003 prepared by defendant indicates that plaintiff had received a secondary diagnosis of narcotic dependence. However, plaintiff's health care providers concluded that there was no such dependency.

### E. *Plaintiff's Second Appeal*

In a letter dated February 27, 2004, Robert A. Mich, plaintiff's lawyer, filed a second appeal on her behalf. By this time, plaintiff had become eligible for benefits under both the short term and long term disability plans. Plaintiff provided additional documentation in support of her appeal including laboratory results, MRI results, x-rays, results from the electromyrogram/nerve condition study and medical records from the following individuals: Dr. Giesen, Gail Jahnke, CNP (Urology), Dr. Richard Kurle (Neurology), Kimberly Olsen, MPT (Physical Therapy), Terri Miechel, CNP (Ob/Gyn) and Stefan Zachary, DO (Hand and Microsurgery).

In a letter dated January 5, 2004, Dr. Giesen updated defendant with respect to plaintiff's condition. He wrote that plaintiff was unable to "perform the substantial and material duties of her occupation due to symptoms related to her diagnoses of fibromyalgia, chronic pain syndrome, and chronic fatigue" and that he believed her condition met the plans' definition of "disability" as of August 2003. In another letter dated February 2, 2004, Dr. Giesen wrote the following: "At this time Terri cannot perform the functions of her job. The pain, fatigue, memory problems make it very hard for her to function." Dr. Giesen wrote a third letter dated February 11, 2004 in which he reiterated his belief that plaintiff was disabled.

The medical records revealed that plaintiff underwent carpal tunnel surgery on October 27, 2003 and December 1, 2003. Dr. Zachary, plaintiff's surgeon, indicated on January 6, 2004 that she was doing well and was not experiencing complications from her surgeries. Dr. Zachary did not address plaintiff's other health problems.

Dr. Kurle's evaluation of plaintiff's short term memory indicated that she was "alert and oriented, fluent and entirely appropri-

ate with good naming, recall, repetition, and attention for serial 7's" and that she demonstrated good recall of simple and complex items. Dr. Kurle noted further that (1) although plaintiff may have had subjective memory problems, he could not detect any problems objectively on the basis of relatively rigorous short term memory testing and (2) she had visited an emergency clinic for migraine headaches which improved with medication. However, Dr. Kurle noted also that plaintiff's "attentional symptoms are most likely due to her medications."

In examining plaintiff's second appeal, defendant endeavored to define her occupation. It reviewed Comfort Systems USA's description of her job and consulted a dictionary of occupation titles, O*Net and the Occupational Outlook Handbook. Occupational definitions are the result of comprehensive studies of the way similar jobs are performed across the nation and are composites of data collected from diverse sources. Using these sources, defendant determined that the functions and skills required to successfully perform plaintiff's job placed it in the occupational category "Cost Estimators," which is considered a sedentary occupation. According to Comfort Systems USA, plaintiff's work week was 45–50 hours, Monday through Friday. Defendant determined that her job was sedentary in nature. It concluded also that, under the plans' definition of "material and substantial" duties, if plaintiff was required to work more than 40 hours a week on average, it would consider her able to perform that requirement if she was working or had the capacity to work 40 hours a week.

In addition to determining plaintiff's occupation, defendant reviewed the additional medical documentation plaintiff had provided as well as the documentation already on file. It noted that all of plaintiff's blood tests were within normal limits and that the x-rays and MRI of her neck, back, hips and head had been unremarkable. Dr. Giesen's physical examinations of plaintiff showed no abnormal swelling or synovitis of joints that would indicate a pathological joint disorder. Other than tenderness, her examinations were normal. Defendant noted further that before August 1, 2003, the primary focus of plaintiff's treatment appeared to be Dr. Giesen's concern about her dependence on narcotic medications. Also, it noted that all of the tests related to plaintiff's bladder problems were negative and that there did not appear to be any recent treatment related to irritable bowel syndrome. Defendant noted that plaintiff had several visits to the emergency clinic since 2001 for reported migraine headaches but that she had responded well to Imitrex.

After reviewing the medical documentation, defendant determined that the available medical records did not document a change in plaintiff's multiple chronic conditions that would have resulted in a sickness and injury precluding her from performing the material and substantial duties of her regular occupation as an estimator since August 1, 2003. Therefore, it affirmed its decision to disallow plaintiff's claim for short term and long term benefits.

With respect to plaintiff's carpal tunnel syndrome, defendant concluded that plaintiff was entitled to limited benefits under the short term disability plan but not the long term disability plan. First, defendant concluded that the medical evidence did not support the existence of an impairment resulting from this condition as of August 1, 2003. Also, it noted that plaintiff returned to work for a short time in October 2003. However, she stopped working again within a reasonable time prior to her first surgery on October 27, 2003 and her

surgeon indicated on January 6, 2004 that she had responded well to the surgeries. Therefore, defendant determined that she was entitled to benefits under the short term disability plan for the period beginning November 1, 2003 and ending January 13, 2004, the point at which defendant determined that plaintiff was no longer "disabled" under the short term disability plan. With respect to long term benefits, defendant noted that plaintiff's elimination period began on October 18, 2003, the first day she was considered "disabled." According to the terms of the long term plan, the elimination period ended on April 15, 2004. Because plaintiff did not meet the definition of disability throughout the entire elimination period, defendant affirmed its decision to deny plaintiff benefits under the long term disability plan. Defendant notified plaintiff of its decision in a letter dated April 2, 2004.

### F. *Plaintiff's Third Appeal*

By letter dated July 7, 2004, Mich. submitted plaintiff's third appeal of defendant's decision to deny her disability benefits. As part of this appeal, plaintiff provided additional documentation from various treatment providers. For example, Dr. Steven Krause treated plaintiff for adjustment disorder, depressed mood and anxiety after she made multiple complaints of chronic pain on April 20, 2004. Also, physical therapist Kimberly Olsen examined plaintiff on August 18, 2003. Her notes reveal that plaintiff reported tender points "at right TMJ, right shoulder, bilateral hips, right medial knee, bilateral suboccipital, bilateral neck, bilateral upper trap, bilateral rhomboids and lateral gluteals ... Trunk active range of motion-flexion within normal limits, rotation bilaterally within normal limits ... bilateral hip range of motion-internal and external rotation of hips" was within normal limits but painful. Her finding re-

garding strength was "All extremities 4- to 4+/5. Do question if patient was giving full effort as she tended to waiver [sic] with her effort." Her finding regarding Sensory/Neuro was "Intact to light touch to all extremities." Finally, notes from another physical therapist, Lisa Atkins, indicated that, in April 2004, plaintiff was able to walk 30 minutes at 2.2 to 2.5 miles an hour, perform complete aerobic activities, strengthening and stretching programs and reported increased vitality in all activities of daily living.

On September 28, 2004, defendant affirmed its decision to deny plaintiff's claim for benefits under the long term disability plan and the short term disability plan with the exception of her claim for short term disability benefits for the period beginning on November 1, 2003 and ending on January 13, 2004. After reviewing plaintiff's medical records, defendant determined that the physical therapy notes from 2004 showed that plaintiff was able to complete aerobic activities, strengthening and stretching programs, and that her most recent physical examination reported 18 tender points, normal neurological examination and 4+/5 strength. Defendant determined also that the laboratory results and x-rays compiled over the last three years did not indicate significant concern for a systemic rheumatologic condition or for plaintiff's muscular-skeletal system. Defendant determined also that the vocational review supported the conclusion that her occupation was sedentary in nature. (Although defendant hired a private investigator to perform surveillance on plaintiff, he did not find any evidence to dispute her claim of disability.)

In the letter informing plaintiff of its decision, defendant wrote the following:

> We sent all of the medical documentation contained in the file to an inde-

pendent physician ... The file review report indicated the medical documentation confirmed Ms. Olson's diagnosis of fibromyalgia, but did not provide sufficient documentation to confirm a diagnosis of [chronic fatigue syndrome] ... The File review concluded that Ms. Olson was not impaired from performing sedentary work from August 1, 2003 to October 5, 2003 ... The file review indicates a period of impairment from Ms. Olson's carpal tunnel surgeries is supported, and that the medical documentation does not support that Ms. Olson was impaired from performing sedentary work after January 12, 2004.

The doctor to whom plaintiff's medical information was forwarded was Dr. Douglas W. Martin, a Certified Independent Medical Examiner and Certified Evaluator of Disability and Impairment Rating. Dr. Martin specializes in occupational medicine. He did not examine plaintiff personally but based his opinions on his assessment of the documentation defendant provided. He agreed that plaintiff's medical documentation supported a diagnosis of fibromyalgia but did not provide support for a diagnosis of chronic fatigue syndrome as it is defined by the Centers for Disease Control. Dr. Martin noted a period of impairment from plaintiff's carpal tunnel surgeries but agreed with defendant that she was not impaired from sedentary work after January 12, 2004. He concluded also that plaintiff was not impaired from performing sedentary work from August 1, 2003 to October 5, 2003. In his report, Dr. Martin wrote that his opinions did not constitute "recommendations for specific claims or administrative functions to be made or enforced."

According to an evaluation completed by Dr. Giesen and dated June 29, 2004, plaintiff experiences symptoms severe enough to interfere with attention and concentration constantly. The side effects of the medications she takes include fatigue, poor concentration and memory loss. Plaintiff can sit and stand for only fifteen minutes continuously. In an eight hour workday, she can sit a total of less than two hours and stand or walk a total of less than two hours. With the exception of the brief period between October 6 and October 19, 2003, when plaintiff returned to work, she has not been employed since August 1, 2003.

## OPINION

### A. ERISA Standard of Review

██ The Employee Retirement Income Security Act applies to "any plan, fund or program which was heretofore and hereinafter established or maintained by an employer or employer organization or both." 29 U.S.C. § 1002(1). The parties agree that defendant's plans are governed by ERISA. The first question is whether the plans give the administrator discretion to determine eligibility. Under the statute, courts must apply a de novo standard of review to a plan administrator's benefit denial unless the plan's plain language gives the administrator discretionary authority to determine eligibility, in which case courts use the deferential "arbitrary and capricious" standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Militello v. Central States, Southeast & Southwest Areas Pension Fund,* 360 F.3d 681, 685 (7th Cir.2004).

██ In determining which standard of review is appropriate, "the critical question is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, inter-

pretation, and content of the rules in each case." *Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635, 639–40 (7th Cir. 2005). In *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir.2000), the court of appeals set out "safe harbor" language that would insure deferential review: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." That language does not appear in either of the disability plans at issue in this case; however, its absence does not preclude deferential review. *Id.* (no "magic words" needed to trigger deferential judicial review of benefit determinations). As noted above, the focus of the inquiry is whether the employee has adequate notice: "[E]mployees are entitled to know what they're getting into, and so if the employer is going to reserve a broad, unchanneled discretion to deny claims, the employees should be told about this, and told clearly." *Id.* at 333.

Defendant argues that the arbitrary and capricious standard of review is appropriate in this case because the summary plan descriptions of the short term and long term plans provide the requisite notice that defendant maintains discretion to determine eligibility for benefits. For ease of reference, I will restate the language highlighted by defendant in each summary plan description.

| Short term disability plan summary plan description | Long term disability plan summary plan description |
| --- | --- |
| The Prudential Insurance Company of America as Claims Administrator has been delegated the responsibility to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for | The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The deci- |

benefits.

sion of the Claims Administrator shall not be overturned unless arbitrary and capricious.

Plaintiff does not argue that the language in each summary plan description is insufficient to give Comfort Systems USA employees the notice required by *Diaz*. However, she raises separate arguments with respect to each plan as to why the language highlighted by defendant does not warrant deferential review. Therefore, I will address them separately.

1. *Long term disability plan*

Plaintiff has several reasons for giving de novo review to defendant's denial of her claim for benefits under the long term disability plan. First, she contends that this court is bound by the holding in *Diaz*. In that case, the court of appeals concluded that language in a long term disability plan underwritten by defendant Prudential was insufficient to support deferential review. Plaintiff contends that the long term plan at issue in this case contains the same language held insufficient in *Diaz*.

This argument goes nowhere because defendant is not relying on the language that the court found insufficient in *Diaz*, 424 F.3d at 638–39. In that case, the court found the following language insufficient to put employees on notice that the plan conferred discretion on the administrator:

You are disabled when Prudential determines that: you are unable to perform the material and substantial duties of your regular occupation due to your sickness and injury; and you have 20% or more loss in your indexed monthly earnings due to that sickness or injury.

We may request that you send proof of continuing disability, satisfactory to Pru-

dential, indicating that you are under the regular care of a doctor.

Defendant is not arguing that this language gives adequate notice of discretion. It has highlighted the language in the summary plan description that gives it "sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits." Plaintiff does not and cannot argue that this language fails to satisfy *Diaz*'s notice requirement.

 Plaintiff argues next that de novo review is appropriate because the language highlighted by defendant appears in the summary plan description, not in the plan itself, and the absence of discretionary language in the plan trumps the language in the summary. It is undisputed that the long term disability plan does not contain language that grants defendant discretion to determine eligibility for benefits. In light of the presumption that a benefits denial is reviewed de novo when a plan is silent with respect to discretion, *Herzberger*, 205 F.3d at 330, plaintiff contends that the summary's discretionary language conflicts with the plan's silence and that the plan prevails, making de novo review appropriate. *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703 (7th Cir.1999); *see also Reinertsen v. Paul Revere Life Ins. Co.*, 127 F.Supp.2d 1021, 1028–1030 (N.D.Ill.2001) (where summary plan description unambiguously gives discretion to plan administrator but policy on which summary is based is silent, terms of plan prevail).

Defendant contends that a conflict does not exist merely because the grant of discretion is found in the long term plan's summary but not in the plan itself. It argues that the summary is part of the plan and can be a source of discretion. *Ruttenberg v. United States Life Ins. Co.*, 413 F.3d 652 (7th Cir.2005). Also, they cite *Schwartz v. Prudential Life Ins. Co. of America*, No. 04 C 2377, 2005 WL 576857, at *4 (N.D.Ill. Mar.8, 2005), in which the district court reviewed the same language from the long term summary at issue in this case and concluded that it did not conflict with the language of the long term plan.

I find defendant's arguments unpersuasive. First, its citation of *Ruttenberg* is misleading. In that case, the court of appeals ruled that de novo review of a denial of benefits was appropriate after failing to find language in a plan or its summary indicating that a plan administrator retained discretion. *Ruttenberg*, 413 F.3d at 659–60. Defendant cites this case in support of its argument that a summary can be the source of an administrator's discretionary authority. Although the court of appeals did look at the summary in *Ruttenberg*, it was not addressing the question raised in this case, which is whether discretionary language must appear in both the plan and summary if the administrator is to avoid de novo review. Moreover, the court has suggested in other cases that it may be inappropriate to look for discretionary language in a plan summary. *E.g., Wilczynski v. Kemper Nat'l Ins. Cos.*, 178 F.3d 933, 934–35 (7th Cir. 1999). At best, the question remains unsettled.

Second, I am not bound to follow *Schwartz*. I disagree respectfully with its conclusion. In *Schwartz*, 2005 WL 576857, at *4, the court stated perfunctorily that the plan and summary did not conflict without providing any analysis to support its conclusion. The court did not mention the presumption that de novo review is appropriate when a plan is silent with respect to discretion. In this case, defendant does not contest plaintiff's assertion that the long term disability plan does not contain any language that gives defendant

discretion to interpret the terms of the plan or determine eligibility for benefits. In light of the presumption in favor of de novo review, I conclude that the plan and summary conflict. Therefore, the question becomes whether the summary or the plan prevails.

The Court of Appeals for the Seventh Circuit has not addressed the question whether discretionary language in a summary plan description can secure deferential judicial review when the plan itself is silent. However, in several decisions, the court has suggested that the terms contained in a summary can prevail over conflicting terms in a benefit plan. *Helfrich v. Carle Clinic Association, P.C.*, 328 F.3d 915, 916 (7th Cir.2003) ("Every pension plan must publish a summary plan description, and conflicts between this document and the plan itself are resolved in favor of the summary plan description (unless it alerts the reader to look for additional terms in the full plan)"); *Fenster v. Tepfer & Spitz, Ltd.*, 301 F.3d 851, 856–57 (7th Cir.2002) ("it is true that when a[ ] [summary plan description] contradicts a profit-sharing plan, the SPD controls"); *Mathews v. Sears Pension Plan*, 144 F.3d 461, 466 (7th Cir.1998) (noting "principle that the plan summary generally controls in the case of a conflict with the plan itself because the summary is what the plan beneficiaries actually read"); *Herrmann v. Cencom Cable Associates, Inc.*, 978 F.2d 978, 983 (7th Cir.1992) (summary plan description "prevails over the plan itself in the event of a conflict"). In a similar vein, several cases support defendants' position that courts may look to the summary plan description and other plan documents for discretionary language. *E.g., Cagle v. Bruner*, 112 F.3d 1510, 1517 (11th Cir. 1997); *see also* James F. Jordan, et al., *Handbook on ERISA Litigation* § 4.04[C][2] (2d ed. Supp.2005) ("The requisite grant of discretion … may be de-

rived … from any number of plan documents, including the plan itself, insurance contacts, summary plan descriptions, trust instruments, and internal plan memoranda or guidelines.").

On the other hand, in *Health Cost Controls*, 187 F.3d at 711, the court of appeals stated that when

> the plan and the summary plan description conflict, the former governs, being more complete—the original, as it were, which the summary plan description excerpts and translates into language that may be imprecise because it is designed to be intelligible to lay persons—unless the plan participant or beneficiary has reasonably relied on the summary plan description to his detriment.

In addition, most of the decisions that address situations in which discretionary language is found in the summary but not in the plan itself favor plaintiff's position. *Wolff v. Continental Casualty Co.*, No. 03 C 4667, 2004 WL 2191579, at *10–11 (N.D.Ill. Sept.28, 2004); *Billings v. Continental Casualty Co.*, No. 02 C 3200, 2003 WL 145420, at *6 (N.D.Ill. Jan.21, 2003); *Flood v. Long Term Disability Plan for First Data Corp.*, Nos. 00 C 2568, 01 C 1610, 2002 WL 31155099, at *3 (N.D.Ill. Sept.27, 2002); *Akhtar v. Continental Casualty Co.*, No. 01 C 7109, 2002 WL 500544, at *4 (Apr. 1, 2002); *Carter v. General Electric Co.*, No. 98 C 50239, 2001 WL 170464, at *5 (N.D.Ill. Feb.20, 2001); *Reinertsen*, 127 F.Supp.2d at 1028–30; *Clark v. Bank of New York*, 801 F.Supp. 1182 (S.D.N.Y.1992). These decisions rely on the principle that the benefit plan sets the terms of the relationship between it and the participants and the summary cannot expand the administrator's authority. An unstated but important corollary is that ERISA was enacted " 'to promote the interests of employees and their beneficiaries in employee benefit plans[.]' " *Fire-*

*stone,* 489 U.S. at 113, 109 S.Ct. 948 (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)).

As a general matter, courts construe benefit plans in favor of beneficiaries and against plan administrators. *Herzberger,* 205 F.3d at 330. If a participant relies on a provision in a summary that conflicts with the terms of a benefit plan, it makes sense to hold the plan to the terms in its summary. *Helfrich,* 328 F.3d at 917 ("Because ERISA requires plans to prepare summary plan descriptions, and because their content is within the plan's control, it makes sense to give these documents legal effect when relied on.") The present case presents the reverse situation because the provision in the summary favors the plan's administrator, defendant Prudential. To hold that the language in the long term summary prevails over the silence in the plan would undercut one of the public policy goals underlying ERISA and harm the class of persons sought to be protected by the statute. As noted in *Clark,* 801 F.Supp. at 1190, "[a]lthough a plan summary may expand employees' rights when the summary conflicts with the plan itself, no court has found that a plan summary can expand the plan administrator's authority." In *Reinertsen,* 127 F.Supp.2d at 1030, the court expressed the same idea in a different way:

> In the context of granting authority to a plan administrator, unless the policy affirmatively grants discretion, then de novo review applies, even if the [summary plan description] provides otherwise. This approach is consistent with the Seventh Circuit's rationale in *Herzberger* ..., which held that, unless the plan affirmatively grants discretion, then the default rule of de novo review applies.

In its reply brief, defendant analogizes the present case to *Shyman v. Unum Life Insurance Co.,* 427 F.3d 452 (7th Cir.2005). In that case, the court of appeals ruled that deferential review was appropriate where a reservation of discretion was found in a certificate of insurance but not in the body of a disability benefits policy. Defendant argues that the facts in *Shyman* are materially indistinguishable from this case. It is incorrect. The plan documents in *Shyman* stated expressly that the certificate of insurance was part of the disability policy. *Id.* at 455. In the present case, defendant has not highlighted any similar language in the long term plan's summary plan description. Therefore, the ruling in *Shyman* does not apply to the facts of this case.

I conclude that defendant Prudential's denial of plaintiff's application for benefits under the long term disability plan must be reviewed de novo.

2. *Short term disability plan*

With respect to the short term disability plan, plaintiff concedes that the plan's summary contains deferential language but contends defendant did not produce the short term plan. Therefore, the court should employ de novo review under the short term plan because defendant has not shown that the plan contains language that satisfies the *Diaz* standard. Defendant responds that the short term plan and summary are the same document. In reply, plaintiff notes that the language defendant relies on for its discretionary authority appears in a section of the short term plan entitled "ERISA," which begins with the following language:

> The following section contains information provided to you by the Plan Administrator of Your Plan to meet the requirements of the Employee Retirement Income Security Act of 1974 (ERISA).

It does not constitute part of the Plan or of any claims administrative services provided by contractors under the Plan. This statement makes clear that the language that follows it, including the portion highlighted by defendant and reproduced above, is not a part of the short term disability plan. Defendant has not highlighted any other language that gives it discretion to construe the short term plan or determine eligibility for benefits under it. Therefore, de novo review is appropriate under the short term disability plan.

## B. *Review of Benefit Denials*

■ Under the de novo standard of review, I must determine whether defendant's decision to deny plaintiff benefits under the long term and short term disability plans was correct. *Wilczynski*, 178 F.3d at 935. To be considered disabled under the short term disability plan, plaintiff had to show that she was (1) continuously unable to perform all of the material and substantial duties of her occupation as a result of injury or illness; (2) under the regular care of a licensed physician; and (3) not gainfully employed in any other occupation. Similarly, to be considered disabled under the long term plan, plaintiff (1) must not have been able to perform the material and substantial duties of her job as a result of sickness or injury and (2) must have lost at least 20% in her indexed monthly earnings as a result of her sickness or injury for a period of 180 days. The primary disagreement in this case is whether plaintiff introduced evidence sufficient to support a finding that she was unable to perform the material and substantial duties of her job as an estimator.

The undisputed facts reveal that plaintiff's job consisted principally of desk work. As an estimator, plaintiff was responsible for reviewing a variety of documents and preparing time, cost and labor estimates. In the course of reviewing plaintiff's benefit appeals, defendant classified her occupation as "sedentary," most likely because it did not involve a great deal of bodily movement or heavy lifting. However, as plaintiff notes, this classification ignores the job's cognitive requirements. Properly calculating bids and estimates requires the ability to focus and concentrate one's energies for extended periods of time.

Further, it is undisputed that plaintiff's treating physician, Dr. Giesen, diagnosed her with a variety of conditions in 2001, including fibromyalgia, myofascial pain syndrome, chronic pain syndrome, chronic fatigue syndrome, interstitial cystitis, short term memory loss, carpel tunnel syndrome, irritable bowel syndrome, hypertension, high cholesterol, migraine headaches and tennis elbow. At the time plaintiff submitted her original claim, she was suffering from migraine headaches and from symptoms of other conditions including fibromyalgia, carpel tunnel syndrome and chronic fatigue syndrome. Dr. Giesen's diagnosis of fibromyalgia was confirmed by Dr. Martin, who reviewed plaintiff's file at the request of defendant, and by Kimberly Olsen, the physical therapist who examined plaintiff on August 18, 2003. According to Olsen, plaintiff reported multiple tender points on her body, a symptom of fibromyalgia.[1]

---

1. The parties have not provided a description of fibromyalgia or pointed to one in the record. However, in *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir.1996), the court of appeals described it as "a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The

Plaintiff argues that the medical documentation she provided defendant Prudential showed sufficiently that the conditions from which she suffered prevented her from performing the material and substantial duties of her job. She relies primarily on Dr. Giesen's opinion that her physical state had deteriorated to the point that she was unable to work as of August 2003.[2] She notes that he provided several letters to defendant explaining that her conditions left her tired, in constant pain and unable to concentrate. The undisputed facts reveal at least five letters written by Dr. Giesen on her behalf. On August 10, 2003, Dr. Giesen completed a statement in which he listed· plaintiff's primary diagnosis as fibromyalgia and chronic pain and estimated that plaintiff would be able to return to work by October 1, 2003. On October 22, 2003, he wrote that plaintiff's attempted return to work had been unsuccessful because she continued to have problems with memory loss, fatigue, chronic pain and carpel tunnel. In this letter, he predicted that plaintiff would not be able to return to work at least until the end of November 2003. Dr. Giesen wrote a third letter dated January 4, 2004, in which he stated that plaintiff was unable to perform the substantial and material duties of her job because of her fibromyalgia, chronic pain and chronic fatigue. In another letter dated February 2, 2004, he wrote that her memory problems, pain and fatigue impeded her ability to work. Finally, Dr. Giesen wrote a letter dated February 11, 2004 in which he restated his opinion that plaintiff was disabled. On June 29, 2004, Dr. Gies-

en submitted an evaluation of plaintiff in which he wrote that her symptoms interfere constantly with her ability to concentrate, that the side effects of her medications include fatigue, memory loss and inability to concentrate, that she can sit and stand continuously for only fifteen minutes and that, in an eight hour workday, she can sit for no more than two hours and stand and walk no more than two hours.

Defendant argues that it determined correctly that the documentation plaintiff submitted with her initial application for benefits and with her appeals did not indicate that her multiple conditions prevented her from performing the duties of an estimator. According to defendant, plaintiff was not disabled because (1) she was diagnosed with a number of chronic ailments in 2001 but worked full-time for more than two years before applying for disability benefits and (2) no evidence in her medical records indicated that her physical condition had deteriorated to the point that she was unable to continue her job. It is undisputed that defendant denied plaintiff's first application for benefits because of the sedentary nature of her job and her failure to show that her condition had worsened to such a degree that she was unable to perform her job duties. Defendant employed this reasoning also in denying plaintiff's first and second appeals.

As the court of appeals has noted, defendant cannot rely on the argument that an employee is not disabled when the employee has worked with a condition and the

principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body ... that when pressed firmly cause a patient to flinch."

2. To the extent that plaintiff's reliance on Dr. Giesen's letters is intended as an implicit assertion that they are entitled to deference, I note that the Supreme Court has held that "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

condition has not gotten worse. In *Hawkins v. First Union Corp. Long–Term Disability Plan*, 326 F.3d 914 (7th Cir.2003), the court reviewed a denial of benefits to a man who was diagnosed with fibromyalgia in 1993 but continued to work until 2000. The plan argued that because he worked for seven years after his diagnosis without any indication that his condition worsened, he could not be considered disabled. *Id.* at 918. The court disagreed, noting that a "desperate person might force himself to work despite an illness that everyone agreed was totally disabling." *Id.; see also Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 983 (7th Cir.1999) ("Some disabled people manage to work for months, if not years, only as a result of superhuman effort, which cannot be sustained.... Reality eventually prevails, however, and limitations that have been present all along overtake even the most determined effort to keep working."). The court was unwilling to punish a disabled person who endured pain and fatigue in order to keep working by equating his "heroic efforts" with a forfeiture of his entitlement to disability benefits. *Hawkins*, 326 F.3d at 918.

The record in the present case suggests a similar course of events. Defendant is correct that none of Dr. Giesen's letters contain an explicit statement that her conditions had worsened to the point that she was no longer able to work. However, in her application for short term benefits, plaintiff stated that her multiple conditions caused constant pain, made her tired and prevented her from concentrating at work. Also, Dr. Giesen submitted a statement listing her primary diagnoses as fibromyalgia and chronic pain with secondary diagnoses of neuromyopathy (a nerve and muscle disorder) and migraine headaches. Later, in connection with plaintiff's first appeal, Dr. Giesen wrote that plaintiff had

experienced a "flare up" in her symptoms for two years before she stopped working and that her brief attempt to return to work in October 2003 had failed because she continued to "have significant memory loss, fatigue, and tiredness aggravated by work and exacerbation of her chronic pain." Although there is no evidence that Dr. Giesen considered plaintiff's conditions to be disabling *before* August 2003, a reasonable person could conclude that plaintiff had been engaging in "heroic efforts" for some time before that date and that she finally left work because she could not ignore the pain or concentrate on her job duties any longer.

However, defendant relied on more than the lack of any indication that plaintiff's condition had worsened in denying her claims. In support of its denial of her first appeal, defendant noted that x-rays of plaintiff's neck, back and hips revealed nothing remarkable, that her lab results were normal and that she showed no signs of abnormal swelling or synovitis of the joints. (These findings are irrelevant to the extent they were considered in determining whether plaintiff had fibromyalgia because they are not symptoms of the disease. *Sarchet*, 78 F.3d at 307.) Defendant noted further that plaintiff had been able to meet with her doctor and maintain daily activity despite her complaints of fatigue, that her interstitial cystitis could be addressed with a procedure that would require her to miss only one day of work and that her medical records did not indicate that she had ever received any treatment for irritable bowel syndrome since being diagnosed with it.

Defendant justified its denial of plaintiff's second appeal by noting again that her blood tests and x-rays were unremarkable, that she exhibited no abnormal swelling that would indicate a pathological joint disorder, that the tests concerning her

bladder were normal and that she had not received any treatment for irritable bowel syndrome. Also, defendant noted that although plaintiff had been to the emergency room for migraine headaches on several occasions, she responded well to Imitrex. Although plaintiff had complained of problems with memory loss, Dr. Kurle, a neurologist, found her to be alert, oriented and able to recall simple and complex items. He could not detect any problems with her memory using objective tests.

Finally, in denying plaintiff's third appeal, defendant relied on notes from physical therapist Kimberly Olsen, who examined plaintiff on August 18, 2003. According to Olsen, plaintiff displayed normal range of motion and bilateral rotation, although plaintiff's hip rotation was painful. Olsen's finding regarding plaintiff's strength in her extremities was "4– to 4+/5." (Neither plaintiff nor defendant have explained the significance of this finding.) In addition, defendant noted that other documentation plaintiff submitted revealed that she could engage in aerobic activities and stretching and strengthening exercises. Notes prepared by Lisa Atkins, another physical therapist, indicated that plaintiff was able to walk for 30 minutes at 2.2 to 2.5 miles an hour. Also, defendant relied on Dr. Martin's file review and opinion that plaintiff had documented sufficiently a diagnosis of fibromyalgia but that she had not shown that she was prevented from doing sedentary work from August 1, 2003 to October 5, 2003 and after January 12, 2004.

The record contains evidence favorable to both parties. However, further scrutiny reveals that the evidence favoring defendant's position is stronger. There is little doubt that plaintiff has substantiated her diagnosis of fibromyalgia. Nevertheless, to qualify for benefits under the long term and short term disability plans, she had to document how this condition and any other condition prevented her from performing the material and substantial duties of her job. For the most part, the letters submitted by Dr. Giesen are not helpful in this regard because they only describe her symptoms and conclude that she is unable to perform her job duties. In his August 10, 2003 letter, Dr. Giesen states plaintiff's primary and secondary diagnoses. His letters dated October 22, 2003, January 5, 2004, February 2, 2004 and February 11, 2004 contain nothing more than summaries of her symptoms and conclusory assertions of disability. These letters do not contain any analysis of plaintiff's material job duties or any explanation why plaintiff's symptoms preclude her from performing them.

Dr. Giesen did describe some of the physical limitations plaintiff faced in the evaluation he completed on June 29, 2004. He indicated that plaintiff could sit, stand and walk for only short amounts of time and that she continued to have problems with concentration, fatigue and memory loss. However, defendant received a report from a neurologist who found no problems with plaintiff's memory and notes from two physical therapists indicating that, although plaintiff reported tender spots consistent with fibromyalgia, her range of motion was within normal limits, she could perform complete aerobic activities, walk for 30 minutes, perform strengthening and stretching exercises and that she reported "increased vitality in all activities of daily living." The record in this case paints a picture of a woman who lives with pain and has difficulty performing her job duties but who is not completely unable to perform them. Thus, although defendant erred in concluding that plaintiff was not disabled simply because she had worked for two years after being diagnosed with many of her conditions and because her medical records did not indi-

cate that her conditions had deteriorated in the days and months preceding her decision to stop working, its conclusion that she had not provided documentation sufficient to show that she was unable to perform the substantial and material duties of her job is adequately supported by a preponderance of the evidence.

Plaintiff attacks defendant's reliance on the opinion of Dr. Martin in denying her final appeal. The undisputed facts indicate that defendant sent all of the information in plaintiff's medical file to Dr. Martin, a specialist in occupational medicine who holds the title Certified Evaluator of Disability and Impairment Rating. After reviewing her information, Dr. Martin agreed with defendant that plaintiff had made a case for a disabling impairment during and after her carpal tunnel surgeries but that she had not shown that she was disabled before October 5, 2003 or after January 12, 2004. Plaintiff argues that defendant should not have relied on Dr. Martin's report because he wrote that his opinions did not constitute "recommendations for specific claims." However, as defendant notes, it did not base its denial of plaintiff's final appeal solely on Dr. Martin's opinion. Instead, defendant reviewed the documents plaintiff submitted and determined that she was able to perform aerobic activities and strengthening and stretching exercises. Dr. Martin's opinion merely supported defendant's conclusion.

Plaintiff hints that defendant acted improperly by surveilling her surreptitiously and that it should have had a physician of its choosing examine her if it really disputed the severity of her conditions. However, surveillance of employees who file claims for disability benefits is an accepted practice, *Patterson v. Caterpillar, Inc.*, 70 F.3d 503 (1995), and there is no requirement, either in law or either of the disability plans at issue in this case, that a plan administrator must conduct its own physical examination of plaintiff in order to dispute her claim of disability. *Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir.2003).

Two final notes. First, defendant Prudential has not argued that its decision to award plaintiff benefits under the short term disability plan for the time plaintiff had surgery for carpel tunnel should be reviewed or reversed. This opinion does not disturb that decision in any way. Second, because I have concluded that the record supports defendant's decision to deny benefits, I need not address its argument that plaintiff's conditions are subject to the long term plan's limitation for mental illness.

### ORDER

IT IS ORDERED that plaintiff Terri Olson's motion for summary judgment is DENIED. The motion for summary judgment filed by defendants Comfort Systems USA Short Term Disability Plan, Comfort Systems USA Long Term Disability Plan and Prudential Insurance Company of America is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.